[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This foreclosure proceeding arises out of a real estate transaction essentially between two fledgling real estate investors and a seasoned experienced businessman who conveyed the property to them.[1] The transaction occurred on August 16, 1989 when the plaintiff, Brian McKeever (hereinafter "McKeever"), conveyed the title to real estate located at 12-14 School Street in Vernon to Ronald S. Cook (hereinafter "Cook"), and Felice Fiore, Jr. (hereinafter "Fiore"), who were doing business as Elite Investing, the name chosen for their real estate partnership. The purchase price of the transaction was three hundred CT Page 15234 fifty-five thousand ($355,000) dollars. That sum was paid by a first mortgage of two hundred fifty-five thousand ($255,000) dollars and a second purchase money mortgage from Elite Investing for one hundred thousand ($100,000) dollars. In addition to that second mortgage, Philip Fiore, Sr. and Mattea Fiore (hereinafter "the defendants") executed and delivered a guarantee of Elite's obligations under the mortgage and note and granted McKeever a mortgage on property they owned at 31-33 Smith Street in Danbury.
The note secured by the second mortgage on the Danbury property provided for interest at the rate of thirteen (13) percent per annum beginning on August 16, 1989 with no payment due until September 1, 1992. The amount of the debt on the note secured by the second mortgage as of the third anniversary (August 16, 1992) was one hundred thirty-nine thousand ($139,000) dollars (one hundred thousand ($100,000) dollars principal plus three years interest at thirteen (13) percent). On September 1, 1992, Elite was required to make monthly interest only payments of one thousand eighty-three dollars and thirty-three ($1083.33) cents until the date of the maturity of the loan which was specified to be four years (August 16, 1994). Because Elite did not make any of the interest only payments, McKeever declared the loan to be in default. He began his FIRST foreclosure proceedings on February 16, 1993.
The note also provided that in the event that any payment provided therein was not made within fifteen (15) days after it became due, late charge of five (5) percent of the overdue payment, became active and payable. Modern day practice has transformed the classical definition of late charges into a penalty and imposes additional interest over and above the amount stated in the document. The traditional concept of late charges was indeed a payment for the expense incurred by the holder in processing a late payment as it was made. This court declines to accept the contemporary definition of the term and the claim for late charges is disallowed.[2] The court, in reaching this conclusion, is not unmindful that a foreclosure action invokes the equitable powers of this court. To paraphrase an idiom employed in equity "equity frowns upon penalties."
Negotiations for the sale of this property produced a rather lengthy agreement with a multitude of detailed provisions. In it, McKeever agreed to indemnify Elite under certain terms and conditions. Paragraph thirty-one (31) provided that for a "net operating income" or "NOI" credit was to be based on twenty-four (24) months of operating income. McKeever warranted that if Elite did not generate operating income of seventy thousand nine hundred ninety-six ($70,996) dollars in the twenty-four (24) months from the August 16, 1989 closing, that the shortfall would be deducted from the one hundred thousand ($100,000) dollars owed under the note. To compute the NOI, specific expenses would CT Page 15235 be included, i.e., taxes, water, sewer, rubbish and snow removal, insurance, electricity, heat, and minor maintenance not to exceed five thousand ($5000) dollars over the twenty-four (24) month period. This ultimately generated a substantial controversy.
Approximately four (4) years into the relationship, the young entrepreneurs received information that the State of Connecticut might well exercise its rights of eminent domain against the property in Vernon. As a result thereof, Elite was able to make a payment of one hundred five thousand ($105,000) dollars in exchange for release of the mortgage on the Vernon property. No release of the Danbury property was provided and no endorsement on the note indicating that it was paid in full was entered by McKeever.
The foreclosure instituted in February of 1993 was defended by the Fiores who labored under the delusion that once the eminent domain proceedings were concluded, that the foreclosure would be resolved. The foreclosure continued even after the payment of the one hundred five thousand ($105,000) thousand dollars. It was also their erroneous impression that there would be a NOI credit that would offset any remaining debt after the payment of that amount. The foreclosure was dismissed on September 19, 1997 when McKeever's attorney failed to appear for trial. McKeever, as well, did not appear even though he had filed a pro se appearance at the time. The case was dismissed "with prejudice." That attorney moved to set aside that dismissal. The Fiores' attorney did not object, and the dismissal was vacated.
It was reassigned for trial on January 20, 1999 and, again, neither the plaintiff nor his counsel, a different attorney, appeared for the trial. The case was again dismissed "with prejudice." The second attorney tried to vacate the dismissal but the court denied the motion on May 3, 1999. After this dismissal, McKeever instituted another foreclosure proceeding on June 24, 1999. His current counsel asserted at trial that the action was brought under § 52-592 of the General Statutes, the accidental failure of suit statute. However, this fact and theory were never pleaded in the complaint. The defendants claim that this failure violates §10-3 (a) of the Practice Book which provides "[w]hen any claim made in a complaint . . . is grounded on a statute, the statute shall be specifically identified by its number." This failure to cite the relied upon statute is therefore fatal to the complaint. While this theory is somewhat intriguing, our Supreme Court has declared that § 10-30 of the Practice Book is merely directory and not mandatory. Skakel v.Benedict, 54 Conn. App. 663, 684 (1999) and cases cited therein. Consequently, the court cannot agree with the defendant's position.
The defendants contend that NOI was thirty-six thousand five hundred CT Page 15236 thirty-four ($36,534) dollars. This figure, when taking the baseline of seventy thousand nine hundred ninety-six ($70,996) dollars from which that shortfall is subtracted, leaves a NOI credit of thirty-four thousand four hundred sixty-two ($34,462) dollars. Assuming the debt as of April 13 to be forty-two thousand six hundred sixty-six dollars and forty ($42,666.40) cents, from which the thirty-four thousand four hundred sixty-two ($34,462) dollars would be subtracted, leaves an indebtedness of eight thousand two hundred four dollars and forty ($8204.40) cents. The defendants bear the burden of proving the accuracy of the NOI. Elite offered evidence from the certified public accountant who analyzed the NOI credit and the bases which he used. The court does not find his testimony to be worthy of belief predicated upon the information, the data which were furnished to him by Elite and the defendant.[3]
McKeever has raised many objections and inaccuracies in that data. In addition to the numbers used, the period of usage and the bases employed are all controverted. The court is inclined to agree with McKeever on this issue, not necessarily because of his evidence, but of the failure of the defendants to convince the court that the NOI credit is accurate.
This court is seriously troubled by the extreme lack of diligence in the prosecution of this foreclosure proceeding to a conclusion. It was dismissed twice for failures of McKeever and his two different attorneys to appear. Between January 29, 1993 and October 9, 2001, the date of conclusion of the trial when briefs were filed with the court, it took eight (8) years and nine (9) months to resolve this proceeding. Such lack of diligence is outrageous and cannot be tolerated. To add insult to injury, the plaintiff claims that he be reimbursed for the attorney's fees charged by each of these attorneys who permitted the case to be dismissed. It is somewhat difficult for the court to believe that he paid those fees for such questionable performance. It is equally troubling to this court to award interest on this debt in the face of such dismal prosecution of the claim. Certain it is he is entitled to some interest, and the court invokes its equity powers and will award simple interest from the date of default September 1, 1992 until September 1, 1993. While the length of that period may be challenged, it is the opinion of this court that that period is more than sufficient to try a case of this nature to a conclusion. "An action to foreclose a mortgage is peculiarly an equitable action." Brand v. Woolson, 120 Conn. 211, 214; citing therein Beach v. Isacs, 105 Conn. 169.
To summarize the history of this foreclosure, the less than adequate representation by two of the plaintiff's former counsel, as well as the plaintiff's negligence in the prosecution of this foreclosure which raises the doctrine of unclean hands, mandates the court to disallow most of the claim for interest and to correct and prevent an injustice (length of CT Page 15237 time for the computation of interest awarded).[4]
The computation of the debt therefore is this:
1. September 1, 1992, one hundred thirty-nine thousand ($139,000) dollars.
2. Interest thereon at thirteen (13) percent amounts to eighteen thousand seventy ($18,070) dollars per year.
3. Interest thereon per month amounts to fifteen hundred five dollars and eighty-three ($1505.83) cents.
4. Interest thereon per day amounts to fifty dollars and nineteen ($50.19) cents.
5. Interest thereon for seven (7) months twenty-three (23) days amounts to eleven thousand six hundred ninety-five dollars and eighteen ($11,695.18) cents.
6. The April 23, 1993 payment; one hundred five thousand ($105,000) dollars.
7. The April 23, 1993 debt thereafter amounts to forty-five thousand six hundred ninety-five dollars and eighteen ($45,695.18) cents.
8. Interest on that debt amounts to five thousand nine hundred forty dollars and thirty-seven ($5940.37) cents per year.
9. Interest thereon amounts to four hundred ninety-five ($495) dollars per month.
10. Interest thereon amounts to sixteen dollars and fifty ($16.50) cents per day.
11. Interest thereon for four (4) months seven (7) days amounts to two thousand ninety-five dollars and fifty ($2095.50) cents.
12. The amount of the debt found by the court, including interest with the adjustments, is forty seven thousand seven hundred ninety dollars and sixty-eight ($47,790.68) cents.
The plaintiff is also entitled to reasonable value of the services rendered by his present attorney. The court finds the sum of forty-two hundred ($4200) dollars to be fair and reasonable and so awards. CT Page 15238
Judgment may enter that the plaintiff recover the sum of forty-seven thousand seven hundred ninety dollars and sixty-eight ($47,790.68) cents of the defendants, together with counsel fees in the amount of four thousand two hundred ($4200) dollars and costs of suit.
Moraghan, J.T.R.